The first case scheduled for argument is number 20-2658, Salveson v. JP Morgan Chase & Co. Mr. Alioto. Good morning. Thank you, Judge. Thank you. Good morning, Judge Kearney. Thank you. Uh, good morning, your honors. May it please the court. My name is Joseph Alioto Jr. I represent the plaintiff appellant cardholders in this case. Your honors, this morning, I want to highlight three main points from the briefs. First, the fact that it is very clear that the district court abused its discretion in analyzing the American Express case and in denying our rule 60 motion. Second, I want to describe how that error is a cascading error, which necessarily infected the district court's ultimate conclusion when it applied the apple versus pepper decision in the Supreme court. And then third, I want to talk about the extraordinary circumstances that have occurred in this case as a result of the district court's inconsistent application of the change in, uh, an intervening change in controlling law to two different plaintiff groups injured by the exact same price fixing tort. So first, your honors, let me begin with the American Express decision. There is no question in this case that the district court abused its discretion in applying the Supreme court's American Express case, but can I, can I interrupt you even before we go there? Yeah, this is sort of deja vu all over again, Mr. Alioto, right? You argued this once before, uh, in 2016. In fact, I think judge Carney was on the panel, but the, but the panel concluded that the district court correctly determined that the complaint failed to plausibly allege that plaintiffs directly pay interchange fees and are directly injured by their imposition. That's basically a factual characterization of the allegations. And why is that not as true today as it was five years ago? Uh, judge Sullivan, the, the, the issues before, uh, the court on the very first Salveson appeal are different than they are in this case before the court today. The Salveson decision, uh, the original appeal was based on two concepts. Uh, and one of them was the court's conclusion that the structure of the that the cardholders did not pay the interchange fee. Now Apple, which is an intervening change in law has changed that analysis and necessarily indicates that, uh, the cardholders do in fact pay the interchange fee. Here's what I mean. The structure of the transaction in the Apple case involves an intermediary or a consumer, and then it, it absorbs, it takes the unlawful fee and then it sends the remainder upstream to the, uh, to the app merchant, the Supreme court held in America and the Apple decision that even though the merchant's revenues were reduced by the amount of that overcharge, the app merchant was not the direct purchaser, the direct purchaser is the consumer. Now that we have Apple wasn't, Apple was the retailer. They own the app store, whereas here the merchant is the retailer. So I don't understand how the Apple decision, uh, impacts the analysis here. You still have, uh, under that analysis, any intermediary, right? No, Your Honor. The, the key to this is that after American Express, cardholders are transactions. Now, if that is true, and if that is the product at issue, then the issuing bank is the retailer of the transaction. Just looking at the solvents point. The bottom line is Illinois brick is still good law. AmEx didn't overrule Illinois brick. And I still don't understand, uh, how your client could be found to be the direct payer of the interchange fee. I just don't follow that. How are the interchange fee? They're paying the same as someone who's not using their card. Uh, the issuing bank takes the fee away from the acquiring bank. Um, and the argument here is, uh, ultimately that the merchant somehow is passing that cost on to your clients, the cardholders, but that's not direct. Your Honor. Um, uh, respectfully, I think that's the incorrect way to look at it in light of the new laws that have been established by the Supreme court. So American express establishes beyond any question that can suit that the cardholders and the cons are consumers of the only product sold, which is a transaction. Now, if that is the case, and as we have, and the, and the, uh, defendants in this case concede that there is no intermediary between the issuing bank and the cardholder in the service of that transaction. Now, the only question that remains is where does the money come from to pay for that transaction under Apple? And in this case, that money comes directly is it is a direct computer generated transfer from the cardholders account into the account of the issuer. Under American express, the product that needs to be analyzed is not the retail is not the merchant's product. It is the product being sold by the issuing bank. And so you have the issuing bank selling a transaction to the cardholder and the transaction with a direct computer generated transfer. If that interchange fee, which is ostensibly compensation for that transaction is unlawfully high, then that is the only issue that the court needs to look at what happens after the fact, your honor, what happens, whether the merchant gets a, excuse me, whether, you know, whether the merchant gets a windfall or what the merchant gets is completely irrelevant. Wouldn't you agree though, Mr. Illinois brick. Yes, that's absolutely correct. Your honor. But the fact that it may be expanding its definition and its approach to defining market in, uh, in, uh, two-sided platform cases doesn't of itself abrogate out of Illinois brick and the direct purchaser requirement. Does it? No, of course not. And I am not arguing that. I am arguing that the express case is not, it's not even about standing at all. Right. It's not about antitrust stand. Uh, judge Sullivan, the idea of, I want to get back to judge Carney's question, but I'm going to answer your question directly. Relevant market cases are very important for establishing standing. Um, if you are a consumer in a relevant market, then under this court's case in aluminum warehousing and in axiomatic Supreme court law, consumers have standing under the law, judge Sullivan, your honor addressed this very issue in the prime international trading case. And it's a summary order and unpublished order from, I believe, August of 2019, where your honor sites, aluminum warehousing, and discusses the concept of consumers having standing. So as consumers, as a result of American express, we now, uh, because we can consume the, uh, transaction. And because we pay more for it than we would have in a competitive market, we are entitled to that interchange, uh, the, the overcharge. Now, your honor, judge Carney, I want to get back to your question. Um, we are not seeking, uh, uh, we are not arguing that Illinois brick doesn't apply, uh, that, that the rule in Illinois brick is gone. What we're saying is that there is no product here that is sold that is passed on to the cardholders. The cardholders do not purchase a transaction from the merchant. They purchase the transaction directly from the issuing bank. That is the undeniable holding of American express. And because that is the case, we are direct purchasers of that transaction from the issuing bank. Now under in paragraphs 38, 47, and 48 of our complaint, we very plainly that the cost of that transaction is directly reduced from the cardholders account and because of that, because there is a direct you about that. Cause I know you place a lot of reliance on that, but if I owe you $10,000, right? I have to pay you $10,000 and it's coming out of my bank account. And the bank says to you, look, if we're going to process this transaction, we're going to take a thousand dollars out. We're only going to give you 9,000 at 10,000. How am I paying that fee? I owe you $10,000. You're the one that's losing that thousand dollars. Not me, even though it's coming, they're going to take that 1,000 out for themselves and give you the other 9,000. How am I paying that fee? I owe you 10. Um, you're judge Carney. May I have some additional time? I see my, yeah, please, please take, uh, take three minutes. We'll add, we'll add time to each side. Okay. Thank you. Um, judge Bianco, if I understand your question, the idea that the merchant has had its, uh, revenues reduced by the amount of the overcharge does not mean that the merchant is paying for the overcharge and that is how am I paying for it, how am I paying for it? I owe 10,000 to the merchant. And you're taking a thousand away from the acquiring bank and then the merchant indirectly, right? Or am I missing something? Um, respectfully, yes. Uh, what we're missing is the very first step in this transaction. And the very first step in the transaction is the exact same thing that happens in Apple. Under Apple, we have the direct payment of the money to the, uh, middleman. The middleman absorbs that charge and it has then reduced the revenues to the app merchant. Now, regardless of what Apple is charging in that case, regardless of what the iPhone user is still paying 99 cents for that app, but the Supreme court held that because the, the overcharge for that unlawful commission taken by Apple is coming directly from the consumer. It is the consumer who has directly paid it. It's really important to just step back and consider the fact that there is only- Can I interrupt you for just a second though? So this factual scenario was always so, and as judge Sullivan points out, we have found as a matter of law and uphold held the finding as a, uh, uh, actually against a clear error challenge that the, uh, uh, purchaser of the individual consumer is, um, not the direct purchaser under Illinois brick. And there are different overlays that have developed because of the Apple case and, uh, Amex, but I don't really understand how that renders the factual finding clear error, the initial, you know, uh, uh, determination that the consumer is not the direct purchaser, um, uh, that would be, uh, entitled to make the, uh, antitrust challenge. I mean, Apple puts it a little bit closer, um, that, but still we're not in an approximate situation. Judge Carney, uh, the, the facts that we've alleged haven't changed. Yeah. The law that the court must apply in viewing those facts has most certainly changed. Now, this court relied on the structure of the transaction and as did the district court in finding that the plaintiffs were not the direct purchasers. The structure of the transaction and how it must be analyzed has dramatically changed as a result of Apple. The structure of the transaction in Apple is functionally equivalent to the structure of the transaction in this case. And it is the consumer who has, is the direct purchaser of the product, um, that is purchased by the middle, but from the middleman. All right. I think we'll hear from your opponent and then we'll, you have reserved several minutes for rebuttal. Thank you. Mr. Bershteyn. Good morning, your honors. Morning. My name is Boris Bershteyn and, um, I represent JPMorgan Chase in this matter, but I will be speaking on behalf of all Applees as I did five years ago when a panel of this court, as Judge Carney will recall, affirmed the dismissal of this case by Judge Gleason and then Judge Brody. The basis for the court's ruling, and I think Judge Sullivan directly alluded to this just minutes ago, was that the structure of credit card transactions as alleged in plaintiff's complaint. And here I'm quoting from JA191, demonstrates that cardholders do not directly pay interchange fees. The complaint hasn't changed. We just heard Mr. Eliott say that the facts haven't changed. And yet plaintiff, plaintiffs asked today for an extraordinary remedy of reopening a final judgment of dismissal. And to obtain that extraordinary relief, plaintiffs must not only demonstrate that the holding of this court from 2016 was abrogated by some change in the law, but also the existence of some extraordinary circumstance that would warrant reopening a final judgment. And as Chief Judge Brody correctly held, they can't get past the first gate. Neither the Supreme Court, nor this court, nor to my knowledge, any other court in the long history of credit card litigation has held that the proposition that cardholders do not directly pay interchange fees, which was the holding of this court, is incorrect. Let me quickly make a few points that are tethered to the colloquy you just had with Mr. Eliott. First, let me just echo the questions that Judge Bianco asked about the fundamental illogic of plaintiff's case.  But what plaintiffs as cardholders pay in no way depends on the level of the interchange fee. How do we know that? Because if you use what's called plain vanilla credit card, a card with a relatively lower interchange fee, and you buy $100 worth of groceries, just an example this court used in 2016, you get a bill from your bank, you pay $100. You could also use a fancy Sapphire premium card that has relatively higher interchange rate, and you still pay $100 to your bank for the same $100 purchase of groceries. You might get additional benefits. You might get some cash back, but that actually cuts against plaintiffs rather than for them. So there's just a fundamental disconnect between the allegations and the complaint about how credit cards work and what plaintiffs are challenging. Now, the argument plaintiffs make today is premised on a fundamental misunderstanding of both the Amex case and the Apple case. And unless the court has questions, I'd be happy to go through those two things. The Amex case is a completely different line of doctrine. What the Supreme Court was confronting in Amex is the question about how to understand the anti-competitive effects of supposedly anti-competitive effects of rules of credit card systems. And to do that, the court had to analyze the economics of how the market works and how the market is structured. And essentially, the majority of the court had held that one can't draw the conclusion that the prices that the credit card systems charge are somehow inflated without looking at both sides of the market. So if the prices on the merchant side were, in some sense, higher in order to create a negative price on the cardholder side, in order to attract more cardholders to the transaction, that cardholder side has to be taken into account in order to properly analyze the anti-competitive effects in an economic market. There's nothing to do with the Illinois BRIC doctrine. Illinois BRIC doctrine is not a doctrine that's tethered to economic analysis of the Supreme Court's own admission. The Illinois BRIC doctrine is a bright line, essentially formalistic rule. That's not a rule that the Supreme Court addressed or purported to address in American Express. In fact, the majority opinion makes clear, and I'm reading here from page 2280 of the Supreme Court's opinion, the Supreme Court reporter, that the network provides separate but interrelated services to cardholders and the Supreme Court isn't saying that the merchants and cardholders are purchasing the same thing. What the Supreme Court is saying is that in analyzing the economics of the market, one needs to consider both sides of the market using this kind of heuristic of market for transaction. But when your adversary says that they're, you know, obviously you can't, even though it's a case about market definition, that can't affect Sandy because they are somewhat interrelated. And their argument is that the Supreme Court said that the transaction is the product, and therefore that changes the standing analysis. And you're saying that the use of the term transaction in the context of the market definition does not alter the standing analysis? Is that essentially what the argument is? No, no, no. They essentially say that it's the transaction itself, right? Not for Illinois BRIC purposes, Your Honor. There are other antitrust standing doctrines, such as those involved in the aluminum cases to which Mr. Elioda referred. Illinois BRIC is not the only doctrine of antitrust standing. There is an efficient enforcer doctrine, which is what this court was addressing in aluminum. And those doctrines often are tethered in some sense to the reality of the market because you have to analyze who the efficient enforcer is. But Illinois BRIC is, you know, as the Supreme Court said over and over again, just a formalistic doctrine. It's about who the direct purchaser is. And maybe this is a good time to pivot over to Apple. Yeah, if you could, because there were strong dissents there. And we are, you know, we have a purchaser who is dealing with Apple directly, but is actually getting access to an app that is removed. So maybe you could address how that ought to affect our thinking. Absolutely, Judge Carney. So let's go back to what was the question that the Supreme Court was purporting to Apple. The Supreme Court was trying to apply the Illinois BRIC doctrine, this formalistic doctrine, to a market that's operating on commission. And so what was Apple's argument? And Apple was arguing to the Supreme Court, ultimately unsuccessfully, that there is a divergence between who directly sells to the plaintiff and who sets the price. Because Apple undisputedly directly sold to the people who use the iPhones and it set the commission on the apps. But what Apple was arguing is that the price is being set by somebody else, by the app developers. And what the Supreme Court says, you know, that argument does not make a difference. There was a 5-4 vote, admittedly, but that was the holding. Why? Because the commission essentially operates like a markup. So the economics of the transaction is sort of like the app developer sets a price and the Apple marks it up and then sells directly to the... So how is that different from the interchange fee? Why doesn't that just generate a markup similarly? So there's a couple of reasons. One, there's no divergence here between who sets the price and who actually sells the product to the consumer. So let's go back to $100 worth of groceries. The person who sold the consumer $100 worth of groceries is the retailer. The person who set the $100, the price of those groceries, is the retailer. And the interchange fee in no way affects that $100 amount as alleged in the complaint. Therefore, it's a, you know, I don't know, square peg, round hole come to mind, you pick your analogy. It's a completely different situation. And the Supreme Court was at pains to point out that the amount of the of the commission or the markup that Apple charges is plausibly alleged to affect what consumer ultimately pays. But that, of course, is the opposite of what's going on in this case, because the consumer is paying $100, whether it's the interchange is relatively high, interchange is low, or as I think Judge Bianco pointed out a few minutes ago, if the consumer pays cash and there's no interchange involved, either, it's still the same $100. Now, that's interesting, but it's not true at gas stations. And I mean, could one not infer that the merchants are factoring in the interchange fees and raising the prices for all transactions, cash and credit card, except for gas stations who only raise them for credit card? So, Your Honor, this court addressed that very question in 2016 in JA, I believe, 195. But yes, that's right. And let me just pull that page because I want to read directly from what this court said. What this court held is we note that plaintiffs explicitly disclaim any intention of alleging generally elevated prices as the basis of their damages. And we express no view on whether such a claim would survive a motion to dismiss. The plaintiffs have consistently disclaimed, Your Honor's theory, the court doesn't need to address it in 2016, and surely it doesn't need to address it today. And in any event, I don't want to suggest that that theory would have legal merit, in part because the gas stations, there's a surcharge for using credit cards, is a surcharge that I know that most gas stations, the credit card companies don't require them to set that surcharge. And so the notion that that surcharge is being paid directly to my client, you know, JPMorgan Chase, is, you know, at least in question, but in any event, this is not the theory that plaintiffs ever pursued. And so we don't need to go with it here in a substantive posture. Unless, unless the court has any other questions, I'm happy to yield the rest of my time. Thank you very much. We'll hear rebuttal. Thank you, Your Honor, I appreciate that. I want to directly address this issue about whether or not the cardholders are paying more based on how the interchange fee is that counsel just referred to this $100 per card. I'm not sure if that's a purchase example. Well, let me just ask before you get there, he pointed to the portion of our summary order from 2016 that observed that you had not alleged in your complaint that consumers generally were paying elevated prices because of interchange fees. Is that, is that correct? Has that changed at all? It's not correct, Your Honor. We allege that at paragraph 101 at the joint appendix, page 57, that among other anti-competitive effects is, quote, causing increased retail prices for goods and services paid by cardholders, end of quote. So this is overall, every cardholder is paying increased prices. Well, as the Amici have, I'm sorry, Your Honor, as the Amici have conceded in their brief, they do change the prices of their products based on what the interchange fee is. And so that's clear. So here, I want to get to this $100 example. I think it's a very, very important point because the court, this is the basis of one of the bases of the court's decision in 2016. If we have a $100 transaction, and assuming the anti-competitive market, the transaction fee, the interchange fee is 3%. Now let's assume that, and so I'm paying, let's, we'll call it $3 on a $100 transaction. I am paying $3 as the cardholder directly to the issuing bank, $3, for the transaction. Now presume, assume that that transaction is in fact only worth 25 cents. I am not paying the same amount to the bank for the transaction. What the merchant obtains, maybe the merchant gets a windfall if it doesn't lower its price when the interchange goes down. That has no bearing on whether or not the cardholder has paid more for the, for the product that is purchased directly from it. Can I just, I want to just clarify something, though. The summary order said, plaintiffs explicitly disclaim any intention of alleging generally elevated prices as a basis for their damages. Was that inaccurate in 2016, or are there new allegations now that make that no longer accurate? No, no, it is accurate, Your Honor. We did make those statements. Those were obviously before Apple, and Apple has changed that, has effectively changed the ability to proceed on that. I am pointing out that that allegation is in the complaint. So I wanted to address the relevant market issue. The relevant market definition does not change based on what, on what legal doctrine is being analyzed. A relevant market is intended to reflect commercial realities. Once we have a relevant market definition, you use the same relevant market definition to ascertain anti-competitive effects, market power, and among other things, standing. So the idea that the defendant just argued, that the relevant market definition in this case for judging anti-competitive effects is what it should be in American Express, but it should be a different, in fact, it should be contrary to American Express for ascertaining whether or not the cardholders are direct purchasers of the product, the only product the company sells. No, that is absolutely not the way it works, and that's the same error that the district court made in its, in its order. Now, Mr. Aliotta, take one minute more to wrap up, please. Okay. Thank you. I just want to note that the defendants themselves relied on a relevant market case in 2014. A relevant market case, which just like American Express, does not talk about Illinois Brick, does not even mention the direct purchaser doctrine, simply a market definition case. That's the visa decision. It relied on visa to show and argue that the cardholders are not consumers in the relevant market. Now, the law has changed. The relevant market definition has changed. We are now consumers in the relevant market. So the defendant's argument that the relevant market definition in American Express is a completely separate doctrine from standing is belied by their own position that they took below, and it is a completely not credible argument. Thank you very much. Thank you. Thank you for your time. We will reserve decision. Thank you. Thank you both.